# IN THE UNITED STATES COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

_____ |
                                         |
THE TOWN OF LEE, MASSACHUSETTS           |          **CASE NO:**
                                         |
Plaintiff,                               |          **JURY TRIAL DEMANDED**
                                         |
v.                                       |
                                         |
MONSANTO COMPANY, SOLUTIA, INC.,         |
PHARMACIA, LLC, DOES 1-100,  and Bayer,  |
INC.                                     |
                                         |
                                         |
Defendants.                              |
_____ |


Respectfully submitted by
**Attorney for The Massachusetts
TOWN OF LEE**

s/*Cristóbal Bonifaz, Esq.*
Cristóbal Bonifaz MA Bar # 548405
*Law Offices of Cristóbal Bonifaz*
*180 Maple Street*
*Conway, Massachusetts 01341*
*Tel: 413-369-4263*
*Cell Number 413-522-7604*
*Electronic Mail* ccrbonifaz@gmail.com

# TABLE OF CONTENTS

**ITEM**                                                          **PAGE**

I. ABSTRACT……………………………………………….…..…1

II. THE PARTIES……………………………………………...3

       PLAINTIFF………………………………………....3

       DEFENDANTS…………………………………….3

III     JURISDICTION AND VENUE……………………………….4

IV. MONSANTO'S MALFEASANCE…………………………….4

      Chemical Properties of PCBs…………………………….7
      Release and Transport of PCBs………………………. 8
      Risks to Human Health………………………………….11
      Monsanto's PCB Manufacturing and Sales……………….12
      Monsanto's Knowledge of PCB Risks and Actions
T       to Downplayed Them……………………………….13

V. THE PARTIAL SETTLEMENT AGREEMENT………………….24

 FIRST CAUSE OF ACTION………………………….29
.

SECOND CAUSE OF ACTION………………………………….33

THIRD CAUSE OF ACTION……………………………. 37

FOURTH CAUSE OF ACTION………………………………….42

VI. PRAYER FOR RELIEF………………………………….45

VII. JURY DEMAND…………………………………….…..46

i

**TABLE OF EXHIBITS**

**EXHIBIT NUMBER**                    **CONTENT**

Exhibits 1-21                    MONSANTO'S INTERNAL DOCUMENTS
                                 1955-1975

Exhibit-22                       CORRESPONDENCE BETWEEN EPA'S
                                 REGIONAL COUNSEL AND ATTORNEY BONIFAZ

Exhibit-23                       EPA's 2022 DOCUMENT ENTITLED
                                 Understanding PCB Risks at the
                                 GE-Pittsfield/Housatonic River Site

Exhibit-24                       License to Use Documentary of Mickey Friedman
                                 Director Producer of *Good Things to Life: GE, PCBS, and
                                 Our Town.*

Ehhibit-25                       PARTIAL SETTLEMENT AGREEMENT BETWEEN
                                 EPA, GE, PITTSFIELD, LEE, LENOX, GREAT BARRINGTON
                                 SHEFFILED AND STOCKBRIDGE

Exhibit-26.                      Intermunicipal Agreement Pittsfield, Lenox, Lee Great
                                 Barrington, Sheffield and Stockbridge.

Exhibit-27.                      Letter to the Editor 2022

Exhibit-28                       Opinion Berkshire Eagle  2022

Exhibit-29                       Transcript Adjudicatory Hearing November 19, 2022

## I.  ABSTRACT

1. Defendants (hereinafter collectively Monsanto) manufactured or acquired corporations who manufactured Polychlorinated Biphenyls "PCBs" from 1929 to 1979 a chemical product with properties usable in a variety of applications.

2. Monsanto knew as early as the 1950s that PCBs were toxic to human life, fauna, aquatic fish, birds and the environment yet it marketed and profited billions of dollars from the sale of 1.4 billion pounds of PCBs it fabricated between 1929 and 1979.

3. General Electric "GE", a customer of Monsanto, used PCBs made by Monsanto on the electrical transformers it manufactured in Pittsfield Massachusetts "City" between 1929 and 1979.

4. PCBs used in electrical transformers lost its insulating properties after some usage at which time GE collected and disposed of the PCBs by burying them in the City at various locations or by dumping the PCBs  into the Housatonic River "River" that runs through the City and the towns of Lenox, Lee, Great Barrington, Sheffield and Stockbridge.

5. The malfeasance of Monsanto and the reckless or as at minimum negligence of General Electric resulted in a massive public nuisance affecting The Town of Lee, "Lee", the River, the City and the towns of Lenox, Great Barrington, Sheffield and Stockbridge. **The public nuisance continues to this day.**

6. GE and Lee  entered into a partial Settlement Agreement "PSA" under which GE agreed to remove, consolidate and bury the PCBs to be removed

from the River, the City of Pittsfield, Lenox, Great Barrington, Sheffield, Stockbridge into a dump to be located in Lee. The City, Lenox, Great Barrington, Sheffield, Stockbridge, Lee, the Environmental Protection Agency "EPA" and GE were signatories to the PSA.

7. EPA had no choice but to agree to GE's choice and accept Lee, the poorest town in the region, to bury there the two million tons of river mud and soil contaminated with PCBs because in spite of the conclusions reached by EPA's scientists and engineers, fully peer reviewed, GE was able to convince the Environmental Appeals Board "EAB" that the EPA remedy to bury all PCBs at an **out of state** location was too costly. (*See details at https://semspub.epa.gov/work/01/586286.pdf*).

8. Lee had no choice but to accept this partial settlement as if Lee refused to sign the PSA, GE would have refused to remove the PCBs from the Housatonic River, the City of Pittsfield, Lenox, Great Barrington, Sheffield, and Stockbridge.

9. Burying the PCBs in Lee instead of transporting them to an out of state location represent savings worth millions of dollars to GE.

10. EPA has estimated that the removal and transport of the PCB public nuisance to Lee from the River, the City, and the aforementioned towns will take thirteen years and will begin upon a favorable resolution on the First Circuit Court of Appeals of a case filed in 2023 against EPA by Lee's residents.

11. GE as part of its partial settlement with Lee will ship out of Massachusetts 140,000 tons of PCB contaminated dry mud and move the remaining

2,000,000 tons of contaminated mud with lower PCB concentrations to the Lee dump. (Exhibit-22, page 2).

12. Lee is Lee is filing this lawsuit against Monsanto to collect damages including punitive damages to which Lee is entitled for the public nuisance to Lee and its residents that will result from the building of a massive PCB dump in Lee containing two million tons of PCB mud and soil.

## II. THE PARTIES
### PLAINTIFF

13. The Town of Lee is located in Western Massachusetts. The River flows through Lee. Lee has a population of 5,693. It has suffered and continues to suffer Monsanto's created PCB contamination of its land, floodplain and River. Lee is located within the jurisdiction of the United States Court for the District of Massachusetts Western division.

### DEFENDANTS

14. Current Monsanto, Solutia, and Pharmacia have entered into various agreements regarding indemnification and the sharing and apportionment of liabilities. These agreements include ones entered when Solutia underwent a Chapter 11 bankruptcy reorganization between 2003 and 2008. Bayer, Inc. purchased prior Monsanto in 2016 for 66 billon dollars.

### III.    JURISDICTION AND VENUE

15. This Court has personal jurisdiction over Defendants in this matter because it is subject to general jurisdiction in this District and moreover is subject to specific jurisdiction through this misconduct believed to exceed one-half million dollars in damages.

16. This Court has Diversity Jurisdiction under 28 U.S.C. Section 1332 since the Plaintiff has different citizenship than of all Defendants.

### IV. MONSANTO'S MALFEASANCE

17. This lawsuit arises out of the contamination of the Town of Lee "Lee" as well as the River and its tributaries by PCBs a group of human-made chemical pollutants. PCBs are ubiquitous contaminants that are detected in human, animal, and plant tissue around the world. PCBs are dangerous to human health, animal health, and the environment.

18. Monsanto made, promoted, marketed, distributed, and sold PCBs and products containing PCBs for a wide range of commercial, household, and industrial uses starting in the 1920s and ending in 1979, after Congress banned PCBs in the Toxic Substances Control Act of 1976.

19. During this period, Monsanto made about 1.4 billion pounds of PCBs. Monsanto made 99% of the PCBs used in the United States. Monsanto promoted, marketed, distributed, and sold PCBs and/or products containing PCBs in and/or near Lee the River and its tributaries.

20. Third parties used products containing PCBs in and/or near Lee and the River.

21. PCBs made by Monsanto have been disposed and/or released into the environment in and near Lee and the River.

22. During the period it made, promoted, marketed, distributed, and sold PCBs, Monsanto knew that PCBs were dangerous to human health, animal health, and the environment. Monsanto knew that PCBs' physical attributes magnified those risks and meant they would persist for many decades, if not centuries, after PCBs were disposed and/or released into the environment. Monsanto knew that PCBs were being disposed and/or released into the environment including in and near Lee the River in massive quantities. Monsanto knew its PCBs were creating a widespread environmental and public health problem that has injured, and continues to injure Lee.

23. Monsanto disseminated disinformation about the dangers of PCBs. Monsanto's internal communications and public statements were severely inconsistent: even as Monsanto internally acknowledged the pervasive risks posed by its large-scale manufacture, distribution, and sale of PCBs. Monsanto minimized or denied those risks in its public statements. For example, Monsanto provided false and/or misleading information to federal, state, and local government authorities that were investigating PCB risks. Monsanto provided false and/or misleading information and improper instructions about PCBs, including disposal instructions, to its customers, distributors, and salespeople.

24.  Monsanto in 1975 conveyed a "Study Group" to determine the impact upon Monsanto's image of PCB manufacture. The "Study Group" concluded among other items that Monsanto with "passage of the Toxic Substances Act, the company will have an additional legal defense against such litigation."

25.  Monsanto's wrongful conduct was designed to maximize the company's profits at the expense of its customers, workers exposed to PCBs, and the public at large.

26.  PCBs have contaminated Lee's buildings, roadways,  infrastructure, inland waters, soils, flora, and fauna.

27. PCBs also have contaminated the waters, lands, floodplains, submerged lands, flora, and fauna of the River.  PCB contamination of the River includes areas within Lee's geographic boundaries, and areas where Lee holds submerged lands.

28.  PCBs have also been discharged intentionally into the River, and buried in landfills by customers of Monsanto.

29. GE purchased highly chlorinated PCBs from Monsanto from 1927 to 1978 to use as coolants and lubricants in transformers, capacitors, and other electrical equipment because they don't burn easily and are good insulators.

30. Monsanto shipped these PCBs to GE's plant located in the City of Pittsfield "City" where the transformers and other equipment were manufactured by GE.

31. GE shipped the assembled transformers all over the United States to be used in electrical transmission lines. PCBs used in transformers have a

short lifespan as insulators forcing GE to constantly replace the transformers.

32. The used transformers were shipped back to GE's Pittsfield plant for disassembly and disposal of the PCBs. GE disposed of used PCBs and waste PCBs from the assembly plant in a variety of ways.

33. GE dumped waste and used PCBs into the river and local landfills. GE created landfills where it buried waste and used PCBs. Truckloads of PCB contaminated soil were transported surreptitiously in the middle of the night by hired contractors to GE's created dumps.

### A.    Chemical Properties of PCBs

34. PCBs are a group of chlorinated hydrocarbons: organic compounds that consist of carbon, hydrogen, and chlorine atoms. Generally, PCBs are categorized based on the number of chlorine atoms in their chemical structure (i.e., their degree of "chlorination").

35. PCBs range from a thin liquid to a waxy consistency. There are no known natural sources of PCBs.

36.  Although different PCBs exhibit somewhat different physical properties, all PCBs have common properties that make them especially problematic pollutants:

    a. PCBs are lipophilic (i.e., tend to be soluble in oils, fats, or lipids).

    b. PCBs are highly stable, durable, and resistant to thermal and chemical degradation.

    c. Most organisms cannot easily metabolize PCBs.

7

37. Although all PCBs are resistant to degradation, more heavily chlorinated PCBs tend to be more durable (and therefore more persistent in the environment) than more lightly chlorinated ones. Once PCBs enter living tissue, more heavily chlorinated PCBs tend to have longer half-lives than less heavily chlorinated PCBs. (Ex.-23: *EPA's Document Titled Understanding PCB Risks at the GE-Pittsfield/Housatonic River; and* Exs.-1 - 21 in support of facts listed on ¶s 34 TO 37).

## B.    Release and Transport of PCBs

38.  PCBs have been released into the environment in many ways. For example:

a. Because Monsanto produced and sold PCBs in massive quantities without adequate warnings and instructions about how they should be properly disposed, PCBs and PCB-containing products were routinely dumped or disposed in landfills, which are not suitable means of disposal. Monsanto knew or should have known that PCBs and PCB-containing products were routinely dumped or disposed in landfills.

b. PCBs entered the environment from accidental spills and leaks of the chemicals, and from accidental spills and leaks of products containing the chemicals. These spills and leaks were exacerbated by Monsanto's failure to provide adequate warnings and instructions. For example, liquid PCBs were frequently used as dielectric (i.e., non-conductive) oil inside electrical transformers. Although electrical

transformers were supposed to remain sealed, transformers leaked, PCBs would be spilled from transformers during maintenance, and PCBs were released when transformers were improperly disposed. Monsanto knew that because of its inadequate warnings and instructions about spills and leaks, and because of its marketing and promotion of PCBs for unsuitable applications where they would inevitably be spilled or leaked, PCBs and products containing the chemicals were being spilled and leaked into the environment in large quantities.

c. Because PCBs are semi-volatile, they routinely vaporized into the air. For example, PCB-containing building materials can vaporize, expose occupants to PCBs through inhalation, and escape buildings. Monsanto knew that because of its marketing, promotion, and sale of PCBs for unsuitable applications where the chemicals could readily volatilize, PCBs were being released into the environment through volatilization.

d. PCBs also entered the environment because of deliberate application of PCBs. For example, Monsanto at times encouraged customers to use PCBs as organic solvents or extenders for pesticides that were sprayed onto crops.

e) **Monsanto knew in 1969 that "From a relatively negligent discharge of 1-3 gallons/day into a large river 1/4-mile downstream levels of 42 ppb in water and 76 ppm in mud were found"** (Ex.-15, page 2).(Emphasis here only).

39.  PCBs continue to be released into the environment today. Among other sources, PCBs are released from contaminated sites, improperly disposed PCB-laden waste, PCB-containing products that are still in service, landfills, and soils and sediment that contain PCBs.

40. Once released into the environment, PCBs cycle in the environment between air, water, and soil.

41. These principles hold true for areas within the City and Towns. PCBs were released into the environment within and near Lee from a wide range of sources. These sources include, but are not limited to, building and construction materials like caulk, roadway paint, dielectric fluid in electrical transformers, and fluorescent light ballasts etc.( Ex.-5).

42.  Once released, PCBs have cycled and transported within and between land, air, and water in and near Lee.

43.  PCBs create numerous environmental risks. For example, PCBs can enter aquatic fauna such as zooplankton and bottom-grazing fish when they eat materials containing PCBs. The fauna readily absorb PCBs but do not easily metabolize them. In part because PCBs are lipophilic, they tend to "bioaccumulate," or build up, in living tissue.

44. PCBs, like many other persistent pollutants, are known to bio-magnify at higher levels of the food chain. Over its lifespan, a predator organism like a bird or carnivorous fish will eat numerous smaller organisms containing PCBs, and the PCBs will build up in that predator organism's tissue.

45. PCBs have been shown to be toxic, cause cancer, and cause numerous other health harms in many non-human living organisms.

46.  Some scientific studies—including studies have found that PCBs are especially harmful to birds that eat fish and/or other aquatic organisms contaminated with PCBs. In such birds, PCBs can cause infertility, developmental problems, eggshell thinning, and other harms.

47.  PCB exposure has been linked to myriad adverse effects in various   other non-human animals. (See Ex.-23 *and*  Exs.-1 -21, for facts listed on ¶s  38 to 47).


### C.    Risks to Human Health


48. Humans can be exposed to PCBs through ingestion, inhalation, and dermal contact.

49. Today, the most common way people are exposed to PCBs is through ingestion of contaminated fish.

50. The principles of bioaccumulation and biomagnification apply to humans. Once PCBs enter the human body, they tend to build up in skin, fatty tissue, and the liver.

51. PCB contamination is one of the main reasons why federal, state, and local governments often advise Americans to avoid eating large quantities of certain types of fish, and fish and/or shellfish from certain PCB-impacted waters.

52. PCBs are acutely toxic.

53. Chronic exposure to PCBs is known or suspected to cause a range of cancers including non-Hodgkin's lymphoma, breast cancer, liver cancer,

gallbladder cancer, gastrointestinal cancers, pancreatic cancer, and skin cancer.

54. Chronic exposure to PCBs is known or suspected to cause numerous non-cancer health effects including cardiovascular, dermal, endocrine, gastrointestinal, hepatic (liver), immune, neonatal, neurological, ocular, and reproductive harm. (See Ex.-23 *and* Exs.-1 -21, Ex.-23 for facts listed on ¶s 48 to 54).

### D.    Monsanto's PCB Manufacturing and Sales – In General

55. The Swann Chemical Company ("Swann") started manufacturing PCBs in 1929. Monsanto purchased Swann in or around 1935.

56. Monsanto's manufacturing of PCBs peaked in 1970, and the company continued manufacturing PCBs until 1977.

57. Monsanto made about 1.4 billion pounds of PCBs.

58. Monsanto made about 99% of the PCBs ever used in the United States.

59. Most of Monsanto's PCB sales were under the trade name "Aroclor." Monsanto also sold PCBs—both alone and mixed with other chemicals—under other trade names like Pydraul, a line of hydraulic fluids.

60. Monsanto categorized many of its Aroclor products (in plural form, "Aroclors") according to their degree of chlorination. For example, Aroclor 1248 was approximately 48% chlorine by mass, while Aroclor 1254 was approximately 54% chlorine.

61. Monsanto aggressively and successfully promoted and marketed Aroclors and other PCBs and PCB-containing products. Monsanto successfully

recommended to its customers that PCBs be incorporated into a breathtakingly wide range of commercial, household, and industrial products. (See Exs.-1 -21, Ex.-23 for facts listed on ¶s 53 to 61).

**E**. **Monsanto's Knowledge of PCB Risks and Actions to Downplay Them**.

62. The allegations in this section are illustrative and represent only a small portion of Monsanto's long history of misconduct that undergirds Lee's claims.

63. Monsanto learned about PCB risks early. Swann observed during the early 1930s that workers at its PCB manufacturing facility often developed dermatitis (skin irritation). Swann nevertheless marketed PCBs for a wide array of commercial, household, and industrial uses.

64. In 1936, the Halowax Corporation reported severe chloracne (an acne-like skin irritation that can be caused by exposure to PCBs) among many of its workers using chlorinated biphenyls. Also, three of Halowax's workers died with symptoms of jaundice. Autopsies showed that two of the three decedents had severe liver damage. Halowax subsequently commissioned a study. Its author warned that PCBs could cause "systemic" toxic effects. Monsanto closely followed the Halowax workers' deaths and the study.

65. By 1944, Monsanto had started to advise its salespeople that PCBs were toxic and could cause liver damage.

66. In the mid-1950s, Monsanto commissioned a study by researchers at the University of Cincinnati College of Medicine that exposed animals to

Aroclor vapors for extended periods of time. This study raised concerns about PCBs' carcinogenicity.

67. Monsanto nevertheless continued to sell PCBs and PCB-containing products without adequate warnings, and continued to recommend their use in a wide range of commercial, household, and industrial applications. Even worse, in and/or around the 1950s, Monsanto promoted using Aroclors as a solvent or extender for powdered DDT (dichloro-diphenyl trichloroethane, the organochloride Rachel Carson wrote about in Silent Spring) and other pesticides to be applied to crops.

68. In September 1955, Monsanto's medical director, Dr. Emmet Kelly, authored an internal memorandum "summariz[ing]" "[Monsanto's] position" about Aroclors. (Ex-1 at pages 1, 2). Kelly wrote, "We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops any type of liver disease and gives a history of Aroclor exposure, I am sure the juries would not pay a great deal of attention to [maximum allowable concentrations]." (Ex-2).

69. Between 1956 and 1957, Monsanto tried to sell Pydraul 150, a hydraulic fluid containing PCBs, to the U.S. Navy for use in submarines. The Navy resisted because it disfavored using toxic compounds like PCBs in confined environments.(Ex-3).  The Navy conducted an animal experiment with Pydraul 150; all the rabbits the Navy exposed to the fluid's vapors died.(Ex-3 at page 1).

70. Monsanto nevertheless concealed the risks of Pydraul:

a. When Monsanto learned that the Navy planned to publish the results of its Pydraul 150 experiment, the company encouraged the Navy to avoid referring to Monsanto trade names.

b. In an April 1957 letter to the Standard Oil Company summarizing toxicity data for four Pydraul products, Monsanto wrote that "the toxicity report on Pydraul 150 indicates that it is practically innocuous when fed orally to rats . . . In rabbit skin and eye irritation studies, Pydraul 150 was no more irritating than a 10% soap solution tested similarly" (Ex-4 at page 1). Monsanto's letter did not mention the Navy's dead rabbits. Monsanto's letter also did not mention the numerous other studies demonstrating PCB risks that the company had conducted, commissioned, or known about.

71. Monsanto's practice of downplaying and concealing PCB risks was not limited to the Pydraul product line. In a May 1957 technical bulletin about Aroclors, Monsanto included only a short section on toxicity. Monsanto claimed, "Animal toxicity studies and 20 years of manufacturing and use experience indicate that Aroclor compounds are not serious industrial health hazards."(Ex-5 at Page-12).

72. However, some Monsanto employees tried to pressure the company to attend to PCB risks. For example, one Monsanto scientist warned in a 1957 internal memorandum about the company's practice of promoting PCBs for use as an organic solvent or extender for DDT and other pesticides that were sprayed on crops. The scientist noted that PCBs were toxic and suggested that their application to crops could pose legal risks.(Ex-6).

73. In a 1960 brochure, Monsanto touted Aroclors as "among the most unique, most versatile chemically-made materials in the industry." (Ex-7, at page 3 ).

74.  Monsanto marketed Aroclors as suitable for a wide range of commercial, household, and industrial applications. (Ex.-5).

75. Meanwhile, Monsanto failed to adopt safeguards, provide instructions, and issue warnings relating to PCBs and PCB-containing products. In many instances, Monsanto took affirmative action to downplay and/or conceal the mounting evidence about PCB dangers. For example: in 1962, Monsanto represented to the U.S. Public Health Service that "[the company's] experience and the experience of our customers over a period of nearly 25 years, has been singularly free of difficulties). (Ex-8 at page 1).

76. In 1963, Monsanto received additional empirical evidence that PCBs were—as expected from its inertness and resistance to degradation— highly persistent in the environment. In 1939,  Aroclors had been applied to test plots at the University of Florida, Gainesboro to determine whether the compounds could be used for termite-proofing. Monsanto documents from 1963 indicate that a researcher revisiting those sites observed "visual evidence of the presence of Aroclor." (Ex-9).

77. In 1966, Søren Jensen and Gunnar Widmark of the University of Stockholm published a landmark study about PCBs. Jensen and Widmark had set out to identify the prevalence of DDT and other pesticides in the environment. However, Jensen and Widmark identified unexpected compounds that they eventually determined to be PCBs. Jensen and Widmark located PCBs in fish, sea birds, conifer needles, and human fat

tissue. In their study, Jensen and Widmark expressed concern that PCBs were spreading widely throughout the environment due to high production volumes, their durability, and their tendency to bioaccumulate and biomagnify. The Jensen and Widmark study prompted substantial internal conversations and correspondence in Monsanto.

78. Despite these red flags, Monsanto's board approved in November 1967 the appropriation of $2.9 million (about $23 million in 2023 dollars) to expand production at two PCB manufacturing facilities.(Ex-10).

79. In early 1968, PCBs caused a mass poisoning in Japan. PCBs leaked from a heat exchanger used in the processing of rice bran oil, contaminating that oil with PCBs. This oil was both consumed directly and fed to poultry. Hundreds of thousands of birds and at least 500 people died.

80. Monsanto's internal memoranda discussed the mass poisoning and the risks associated with Monsanto's PCB-containing products, which also were used inside heat exchangers in food processing plants. Although Monsanto knew it was "a matter of time until the regulatory agencies will be looking down [its] throats," (Ex-11 at Page1). Monsanto did not withdraw its PCB containing products from this use. Instead, Monsanto planned to put customers' "mind[s] at ease . . . by playing down the medical reports." (Ex-11 at page 1).

81. In December 1968, University of California, Berkeley researcher R.W. Risebrough and others published a landmark study about PCBs in Nature. Risebrough and his co-authors found that PCBs were toxic, spread easily and widely once released into the environment, and posed a significant threat to humanity. Risebrough's study, which partly focused on water

ecosystems, reported high concentrations of PCBs in peregrine falcons and dozens of other local bird species. The article linked this contamination to eggshell thinning in peregrine falcons and consequent population declines.

82. Monsanto decided to respond combatively to the Risebrough article. As W.R. Richard, the manager of Research and Development of Monsanto's Organics Division, wrote in an internal memorandum, "Either [Risebrough's] position is attacked and discounted or we will eventually have to withdraw product from end uses which have exposure problems."(Ex-12 at page 2 ).

83. For example, Monsanto issued a press release about the Risebrough article that cast doubt on whether the chemicals Risebrough identified were PCBs, even though the company's internal memoranda acknowledged they were. Monsanto also claimed it was surprised that PCBs were being widely released and dispersed into the environment. Monsanto made similar representations to the U.S. government, feigning surprise at the widespread release and dispersal of PCBs.

84. Around the same time, Monsanto retained University of Illinois researcher Robert Metcalf to assess the PCB problem. Metcalf warned that PCBs were being released to the environment in massive quantities, that these PCBs were circulating and transporting in the environment, and "there is an important environmental quality problem involved in wastes of PCB." (Ex-13 at pages 1,2 underlining in the original).  Metcalf advised that "the evidence regarding PCB effects on environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto. The defensive measures presently

underway will do little if anything to refute the evidence already presented." . (Ex-13 at pages 2,3).

85. Monsanto nevertheless continued to pursue greater PCB sales. For example, in April 1969, Monsanto's president requested its board of directors to approve $1.1 million in appropriations to expand the production of solid Aroclors at its Anniston, Alabama facility. These solid Aroclors were more heavily chlorinated PCBs that Monsanto knew to be more problematic pollutants.

86. In August 1969, Monsanto held a meeting of its "PCB Committee." Handwritten notes from the meeting read, "Subject is snowballing." The handwritten notes identified three "Alternatives": (1) "go out of business"; (2) "sell the hell out of them as long as we can and do nothing else"; and (3) "try to stay in business in controlled applications – control contamination levels." (Ex-14 at page 5. Emphasis in the original).

87. In or around September 1969, Monsanto formed an Aroclor Ad Hoc Committee. At its first meeting, the Ad Hoc Committee "[a]greed to" three "[o]bjectives": (1) "[p]ermit continued sales and profits of Aroclors and Terphenyls" (another type of organic compound); (2) "[p]ermit continued development of uses and sales"; and (3) "[p]rotect image of Organic Division and of the Corporation." (Ex-15 at page1). None of Monsanto's three "objectives" involved protecting the public or the environment from the dangers of PCBs.

88. Monsanto's Aroclor Ad Hoc Committee produced voluminous reports and correspondence. These reports and correspondence showed the Committee knew PCBs were being released to the environment in massive

volumes, and they had become a truly global contaminant. The Committee knew PCBs had been tied especially closely to aquatic organisms and birds that consumed aquatic organisms. The Committee knew PCBs were toxic to humans and animals, PCBs could be harmful even at low concentrations, and PCBs were contaminating human food. The Committee knew the company's products would be scrutinized by regulators and the public. But the Committee pushed Monsanto to prolong PCB sales for as long as possible because they were profitable.

89. In or around 1970, Monsanto achieved record production and sales of PCBs.

90.  As part of its strategy to prolong PCB sales at the public's expense, Monsanto misled the public by representing that PCBs were not being released into the environment at high rates, that PCBs were not being used in household products, and that PCBs were not very toxic. For example, in April 1970, Monsanto released a press release "repl[ying] to [a] charge that PCB threatens the environment" by U.S. Representative William F. Ryan. (Ex-16 at page 2). Monsanto insisted that "PCB is not a household product," despite the company's knowledge that Aroclors were used in carbonless copy paper and numerous other household products. (Ex-16 at page-2).  Monsanto also suggested that PCBs were mostly used in "closed systems" (i.e., systems from which PCBs could not escape) despite its knowledge that PCBs were used in open systems, and its knowledge that PCBs were routinely released even from so-called "closed systems." (Ex-16 at page 2).

91. In 1970 GE was dumping thousands of pounds of PCBs onto the Housatonic River a practice that GE had started at least forty years earlier.

92. In 1970 GE was continuing hauling soil contaminated with PCBs to various locations in the City where it bury the PCBs in the middle of the night without ever bothering to notify the City of the practice.

93. In 1970, Monsanto decided to discontinue Aroclors 1254 and 1260, which were the most heavily chlorinated Aroclors that were widely distributed. By this point, Monsanto had known for many years that more chlorinated PCBs were especially problematic pollutants. A February 1970 interoffice memorandum provided talking points for company representatives' conversations with consumers of these Aroclors. Monsanto stressed to its representatives that the company had decided not to recall these heavier Aroclors: "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We <u>don't want to take fluid back</u>." ( Ex-17 at page 1. Emphasis in the original). Monsanto suggested that customers should be grateful: "We certainly have no reason to be defensive or apologetic about making this change. . . . [O]ur customers should commend us . . . ." (Ex-17 at page 1).

94. Arcolors 1254 and 1262 the most toxic highest chlorinated PCBs were used by GE in their transformers and then dumped onto the River or buried all over the City where many residents owned or built their homes.

95. Despite Monsanto's best efforts, a scandal occurred in 1971. Large volumes of poultry feed marketed in the southeastern United States were found contaminated with PCBs. In turn, this feed had contaminated numerous chickens and chicken eggs.  Also, in the early 1970s:

> a. Monsanto's customers started to express more and more concerns about PCBs.

> b. Monsanto learned about long-term animal studies of chronic PCB exposure that further demonstrated that the chemicals were toxic.

> c. Monsanto learned about detections of PCBs in cow milk traced to Aroclor-containing paint in feed silos.

> d. Further research by Monsanto identified PCBs in a wide range of samples including in human tissue.

96. In September 1971, the United States formed an interagency task force to review existing data about PCBs and coordinate further government investigations. The New York Times published an article about the task force's formation. The newspaper reported, "The Monsanto Company of St. Louis, which is the only American manufacturer of PCB, has been conducting a two-year study of the effects of the chemical on rats and dogs. A company spokesman said that no ill effects had yet been detected." [1] However, Monsanto's contemporaneous internal memoranda suggested that Monsanto's experiments on rats, dogs, and chickens had demonstrated adverse effects, especially reproductive harm in rats and chickens. (Ex-18  at pages 2, 3).

---

[1] Richard L. Lyons, Panel Organized to Study DDT-Like Compound for Environmental Hazards, N.Y. Times (Sept. 23, 1971), available https://www.nytimes.com/1971/09/23/archives/panel-organized-to-study-ddtlike-compoundfor-environmental-hazards.html

97.  In May 1972, the federal task force concluded that "PCB's [sic] were highly persistent, could bioaccumulate to relatively high levels in fish and could have serious adverse effects on human health."[2] The task force recommended discontinuing "all PCB uses except in closed electrical systems'.*( Id*).

98. Over the next few years, the U.S. government continued to sample soils, waters, birds, and fish across the United States. PCBs were found to be ubiquitous throughout the United States including in  water systems. Federal and other researchers also developed even more evidence in animal experiments that PCBs were toxic and carcinogenic.

99. Even as Monsanto came under a regulatory microscope; the company did not relent in its efforts to mislead the public. For example, Monsanto in 1975 manipulated a study it had commissioned by Industrial Biotest Laboratories ("IBL"). IBL had written a report about a two-year Aroclor feeding study involving rats. IBL had concluded that Aroclors were "slightly tumorigenic." Monsanto asked IBL to change this language to "does not appear to be carcinogenic." IBL complied. (Ex-19 and Ex-20.)

100. Ultimately, Monsanto knew the time window for selling PCBs was ending.

101. In December 1975, Monsanto's PCB Study Group addressed in a memorandum the question, "Is the adverse impact now, or in the future, likely to be greater than the benefits derived from staying in the

---

[2]    Review of PCB Levels in the Environment, U.S. Envtl. Protection Agency, at 1 (January 1976), available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000I3HT.TXT (describing the task force's May 1972 findings).

business?" (Ex-21 at page 2).  Focusing solely on its own interests and disregarding the adverse effects of its products on public welfare, the PCB Study Group concluded, "in answer to the question at hand, the negative impact on Monsanto's image will, indeed, exceed the benefits derived from staying in the business."(Ex-21 at page 2) .

102. Knowing that a PCB ban was imminent, the PCB Study Group recommended that Monsanto should phase out PCBs before it was forced to do so. (Ex-21 at page 3).  "Principally, Monsanto must, not be viewed as being forced into a decision to withdraw from PCB manufacture by either government action or public pressure. Rather, key audiences must perceive Monsanto as having initiated responsible action . . . ." (Ex-21 at page 3).

103. In early 1976, Monsanto, consistent with this recommendation, announced the company planned to phase out its production of PCBs.

104.  Several weeks later, in March 1976, the Toxic Substances Control Act passed the  Senate. The Act was signed into law in October 1976.

105.  Monsanto nevertheless continued to sell PCBs until approximately October 31, 1977.

106.  The Toxic Substances Control Act's PCB manufacturing ban became effective on January 1, 1979.

## V. **THE PARTIAL SETTLEMENT AGREEMENT**

107. The Environmental Protection Agency EPA is an independent federal agency, created in 1970, that sets and enforces rules and standards that protect the environment and control pollution.

108. EPA has a 15,000-work force which includes scientists, engineers and attorneys, all dedicated and committed civil servants who in many cases have forsaken profitable employment in  the private sector.  (EPA.gov).

109. in the 1980s EPA embarked  a forty-year odyssey to force GE remove the PCBs from the River.

110. Under its mandate EPA began in the 1980s an investigation of PCBs presence in the River, the City, and the Towns of Lee, Great Barrington, Sheffield, Stockbridge, and Lenox.

111. EPA announced in 1982 that "calculations of the mass of PCBs in the sediments of the river suggest that of a total of 22,200 lbs., about 60% is still located in Massachusetts with nearly all of this amount in sediments in Woods Pond. ( *See Documentary  Good Things to Life: GE, PCBs, and Our Town, Mickey Friedman Director/Producer.* (See: You Tube Documentary and Ex.-24*).*

 112.  By 1988, GE and EPA revised the figure upward to 40 thousand pounds. (*Id.*).

113.  Ed Bates was the former Manager of Tests at GE's Power Transformer Plant in the City of Pittsfield.*(Id*).

114.  Ed Bates stated in a documentary that based on actual use and loss rates he estimates that more than a million and a half pounds of PCBs had gone

down the drains and into the River and that probably 500 thousand pounds of PCBs still remaining in the soil and sediment. (*Id*).

115.  EPA stated in a publication updated February 18, 2022 that between 100,000 and 600,000 lbs. of PCBs remain the Housatonic River. (Ex-23).

116. In2016 EPA issued Order-1 requiring GE to remove the PCBs from the River and move them to an **out of state** location.  *Web Page of Tri-Town Health Department Exhibit -11 at [https://www.lee.ma.us/tri-town-health-department/pages/lee-board-health-111922-adjudicatory-hearing-exhibits](https://www.lee.ma.us/tri-town-health-department/pages/lee-board-health-111922-adjudicatory-hearing-exhibits)*

117. The 2016 Order-1 was appealed by GE to the Environmental Appeals Board "EAB" who ruled in favor of GE **overturning the requirement that the PCBs removed from the River had to be disposed at an out of state facility**. *Housatonic River Initiative et al., v. EPA Case No. 22-1398 Document: 00117963622 Page: 14.*

118. In February of 2020 EPA, GE, the City and the Towns of Lee, Lenox, Great Barrington, Sheffield, Stockbridge in Massachusetts entered into a Settlement Agreement "PSA" to have GE move the PCBs from the River, the City and towns to a location in Lee.  (Ex.-25).

119. In February of 2020 the City of Pittsfield and the Towns of Lee, Lenox, Great Barrington, Sheffield, Stockbridge in Massachusetts entered into an Intermunicipal Agreement "IA" to distribute among themselves 63 million dollars GE agreed to pay to  the City and towns for not legally  challenging further orders of EPA and to cover damages to be encountered by the City and towns during the moving of the PCBs from the River to Lee. (Ex.-26).

120. The population of Lenox and Lee is respectively  5,943 and 5,025 inhabitants.  Lenox's yearly budget per resident is  3.3 times the budget per resident of Lee. Lenox and Lee received from GE equal amounts of

money  confirming the fact that **no payments** were ever  made by GE to Lee for creating the PCB nuisance dump in a former quarry in Lee. (Ex.-26)

121. Lee was left no choice but to accept the condition that the PCB dump be installed in Lee. The no-choice which EPA was forced to accept by the EAB (¶s 7 and 116 supra )  was to bury the PCBs at an **in-state** location.

122. The no-choice to Lee and EPA was succinctly stated by EPA in a correspondence with counsel dated November 8, 2022:

> We appreciate the Board's concerns. It is important to reiterate, however, that the actual, ongoing threat to human health and the environment lies with the currently uncontrolled PCB contamination present in the River sediment and floodplain soil. Over 285,000 cubic yards of uncontrolled contaminated sediment is in Woods Pond and an additional 60,000 cubic yards is present in other River impoundments located downstream of Woods Pond in the Town of Lee. … *Comparative Analysis*. By safely removing, transporting, and disposing of contaminated material in the secure UDF and at off-site facilities, the remediation of the river and floodplain will result in **decreased risks to the health of Lee residents. Ex.-22 at page 6 of 7**)(Emphasis here only).

123. In December of 2020 EPA issued a Final Order requiring GE to remove the PCBs from the River. (*Exhibit-12 supra reference cited  ¶116).*

124. In September 24, 2021 GE submitted a design of the agreed upon Lee PCB dump. *(Exhibit-5 supra reference cited  ¶116).*

125. The PSA **DID NOT** eliminate causes of actions for continuing public and private nuisance and trespass against  **Monsanto by  the Town of Lee** since the continuing nuisance present in the River, City and towns remains and will  merely be moved by GE from the River and other locations  to the planned dump in Lee. *Id., Exhibit-5, supra reference cited  ¶116).*

126. GE expects to save millions dollars by the projected burying of the PCBs in Lee rather that transporting them out of state as per EPA's first order.

127. The projected PCB dump to be installed by GE in Lee is a continuing public nuisance to Lee and it's the residents and a public and private nuisance to the Town of Lee as evident from a variety of facts represented here by a sample of evidence to be submitted to the jury:

    a. The River, sediments, waters, flora, and fauna remain contaminated with PCBs. Flood plains, and areas owed by Lee's residents and the Town of Lee remain  contaminated with PCBs.(Ex-23).

    b. Citizens groups in Lee have challenged Final Order of EPA in a case currently in the Court of Appeals of the First Circuit. *Housatonic River Initiative et al., v. EPA First Circuit Court of Appeals Case*  No. 22-1398.

    c. Residents of Lee have requested the Board of Health of Lee to establish whether the proposed PCB dump presents a risk of health to the residents of Lee(*Exhibits 1-26 supra reference cited ¶116).*

    d. Opinion pieces and letters to the editors of local newspapers are evidence of the public nuisance to which Lee and its residents will be subjected while the PCB dump is being built and upon completion of the same, if it comes to pass. (Exs.- 27 and 28).

    e. Comments and documents filed by Lee's residents at the aforementioned Board of Health Adjudicatory Hearing, indicate the level of terror and fear of the residents of Lee caused by the current plan to build a PCB dump within the confines Lee. (  See Transcript of adjudicatory hearing Ex.-29 and *Exhibits1-26  supra reference cited  ¶116).*

f.   Page 52 Lines 19-24; page 53 Lines 1-24.; page 54 Lines 1-54; page 55 Lines 1- 24; page 56 Lines 1-24; page 57 Lines 1-14. (Ex-29).

g.   Page 57; Lines 21 to 24; page 58 Lines 1 to 24; page 59 Lines 1-9. *Id.*

h.   Page 59 Lines 16 to 24; page 60 Lines 16 to 22. *Id.*

i.   Page 66 Lines 5 -21; page 68 Lines 6 to 224. Id*.*

j.   Page 76 Lines 16 to 224; page 77 Lines 1 to 24; page 78 Lines 1-2; page 79 Lines 14 to 24; page 80 Lines 1 to 24; page 81 Lines 1 to 3;  page 84 Lines 5 to 13. *Id*.

## **FIRST CAUSE OF ACTION**

**Continuing Public Nuisance on Behalf of the People of the Town of Lee Against All Defendants.**

128. The People, by and through the Town of Lee "Lee" incorporate by reference each allegation contained above.

129. Buildings, roadways, infrastructure, inland waters, flora, and fauna in the Town are contaminated with PCBs.

130. The Housatonic River 's sediments, waters, flora, and fauna are contaminated with PCBs. This contamination includes sediments, waters, flora, and fauna within Lee's geographic boundaries.

131. PCB contamination of the Lee and the Housatonic River is a continuing public nuisance that substantially and unreasonably interferes with rights common to the public, including a substantial number of Lee' residents:

   a. This PCB contamination threatens the health of people who eat fish harvested from the River.

   b. This PCB contamination interferes with the public's right to use the River for fishing and recreational activities.

   c. Monsanto has unlawfully obstructed people from using the River in the customary matter by limiting their ability to fish and consume fish from the River.

   d. This PCB contamination has harmed a range of living organisms.

132. PCB contamination of Lee and the River has simultaneously affected hundreds of persons.

133. PCB contamination of Lee and the River is severe, pervasive, and costly. Especially because the Lee has cultural, economic, environmental, and social value, any ordinary person would be reasonably annoyed and disturbed by this contamination.

134. Monsanto, by acting or failing to act, created this public nuisance or permitted it to exist. Monsanto's conduct amounted to affirmative knowing action to create the nuisance:

   a. Monsanto made about 99% of the PCBs ever used in the United States.

   b. Monsanto made virtually all the PCBs that contaminate Lee and the River today.

c. Despite knowing about their dangers, Monsanto wrongfully promoted and marketed PCBs and PCB-containing products for an extremely wide range of commercial, household, and industrial uses and applications. This promotion and marketing caused PCBs to be used or misused in a wide range of unsuitable commercial, household, and industrial uses and applications, from which PCBs would inevitably be discharged into the environment in large quantities.

d. Monsanto made false or misleading statements about the dangers of PCBs and PCB-containing products, the prevalence of PCBs in products, the likelihood of PCB releases, and the prevalence of PCBs in the environment.

e. Monsanto also concealed the dangers of PCBs and PCB-containing products, the likelihood of PCB releases, and the prevalence of PCBs in the environment. Monsanto's concealment and false or misleading statements increased PCB sales, generating profits for the company at the expense of creating this continuing nuisance.

f. Monsanto manufactured, promoted, marketed, distributed, and sold PCBs and PCB-containing products without providing adequate warnings and instructions about how they should be properly used, handled, and disposed.

g. Despite knowing that more heavily chlorinated PCBs were more problematic pollutants, Monsanto nevertheless promoted, marketed, distributed, and sold them aggressively. To facilitate this conduct, Monsanto continued to invest heavily in expanding its manufacturing

capacity for heavily chlorinated PCBs, long after the company learned about heavily chlorinated PCBs' particular risks.

h. Even after learning about PCB risks, Monsanto chose not to thoroughly investigate them.

i. Monsanto consciously decided not to recall or take back PCBs and PCB containing products.

j. Monsanto's actions and failures to act caused PCBs to contaminate Lee and the River at levels that pose unacceptable risks to human health and the environment.

135. The seriousness of the harm caused by Monsanto outweighs the social utility of Monsanto's conduct.

136. Lee and the people of Lee did not consent to Monsanto's culpability for this public nuisance.

137. The harms associated with this public nuisance are reasonably abatable.

138. Monsanto has failed to abate the public nuisance of PCB contamination of Lee and River.

139. Each of the Defendants has succeeded to, and/or has agreed to bear, the liabilities of Original Monsanto relating to PCBs.

140. General Electric, a customer of Monsanto, would be a codefendant in this lawsuit if not for the fact that GE has settled the matter with Lee as per the Settlement Agreement entered into by Lee, the City, all affected towns, GE and EPA as per the facts stated in this Complaint.

141. GE's Settlement Agreement with Lee involves removing the PCB nuisance from the River and burying it in a dump in Lee.

142. Monsanto has not settled the nuisance lawsuit with Lee and is the remaining responsible party for maintaining the PCB nuisance that will remain in Lee after GE completes removal the PCBs from the River and buries them in Lee.

143. For these reasons, Lee prays for relief as set forth below.

## SECOND CAUSE OF ACTION

**Continuing Public Nuisance, by the Town Against All Defendants.**

144. Lee incorporates by reference each allegation contained above.

145. Buildings, roadways, infrastructure, inland waters, flora, and fauna in Lee are contaminated with PCBs.

146. The River 's sediments, waters, flora, and fauna also are contaminated with PCBs. This contamination includes sediments, waters, flora, and fauna within Lee's geographic boundaries.

147. PCB contamination of Lee and the River is a public nuisance that substantially and unreasonably interferes with rights common to the public, including a substantial number of Lee's residents:

 a. This PCB contamination threatens the health of people who eat fish taken from the River.

 b. This PCB contamination interferes with the public's right to use the River for a range of beneficial uses including, but not limited to, recreational and fishing.

 c. Monsanto has unlawfully obstructed people from using the River

in their customary manner by limiting their ability to extract and consume fish from the River or use it for boating and other recreational activities.

d. This PCB contamination has harmed a range of living organisms.

148. PCB contamination of Lee and the River has simultaneously affected hundreds of persons.

149. PCB contamination of the Lee and the River is severe, pervasive, and costly. Especially because Lee and the River have cultural, economic, environmental, and social value, any ordinary person would be reasonably annoyed and disturbed by such contamination.

150. Monsanto, by acting or failing to act, created this public nuisance or permitted it to exist. Monsanto's conduct amounted to affirmative knowing action to create the nuisance:

a. Monsanto made about 99% of the PCBs ever used in the United States.

b. Monsanto made virtually all the PCBs that contaminate Lee and the River today.

c. Despite knowing about their dangers, Monsanto wrongfully promoted and marketed PCBs and PCB-containing products for an extremely wide range of commercial, household, and industrial uses and applications. This promotion and marketing caused PCBs to be used or misused in a wide range of unsuitable commercial, household, and industrial uses and applications, from which PCBs would inevitably be discharged into the environment in large quantities.

d. Monsanto made false or misleading statements about the dangers of PCBs and PCB-containing products, the prevalence of PCBs in products, the likelihood of PCB releases, and the prevalence of PCBs in the environment. Monsanto also concealed the dangers of PCBs and PCB-containing products, the likelihood of PCB releases, and the prevalence of PCBs in the environment. Monsanto's concealment and false or misleading statements increased PCB sales, generating profits for the company at the expense of creating this nuisance.

e. Monsanto manufactured, promoted, marketed, distributed, and sold PCBs and PCB-containing products without providing adequate warnings and instructions about how they should be properly used, handled, and disposed. Monsanto also directed PCB customers and users to use, handle, and dispose PCBs in improper ways that caused PCBs to be released into the environment.

f. Despite knowing that more heavily chlorinated PCBs were more problematic pollutants, Monsanto nevertheless promoted, marketed, distributed, and sold them aggressively. To facilitate this conduct, Monsanto continued to invest heavily in expanding its manufacturing capacity for heavily chlorinated PCBs, long after the company learned about heavily chlorinated PCBs' particular risks.

g. Even after learning about PCB risks, Monsanto chose not to thoroughly investigate them.

h. Monsanto consciously decided not to recall or take back PCBs and PCB containing products.

i. Monsanto's actions and failures to act caused PCBs to contaminate Lee and the River at levels that pose unacceptable risks to human health and the environment.

151. The seriousness of the harm caused by Monsanto outweighs the social utility of Monsanto's conduct.

152. Lee did not consent to Monsanto's culpability for this public nuisance.

153. The harms associated with this public nuisance are reasonably abatable.

154. Monsanto has failed to abate the public nuisance of PCB contamination of Lee and River.

155. Lee has suffered harm different from the type of harm suffered by the general public:

a. Lee has particular duties to safeguard the health of its residents and visitors.

b. Lee has particular duties to comply with PCB discharge limitations into the River.

c. Lee has suffered damages because of the public nuisance. Lee has already have borne  investigation, planning, compliance, and/or other costs and losses.

d. Lee will suffer damages because of the public nuisance. The Town will continue to bear substantial monitoring, investigation, planning, compliance, and/or other costs and losses because of PCB pollution in Lee and the River.

e. Lee owns, controls,  or otherwise is responsible for large swaths of property affected by PCB contamination.

f. Large portions of the River , which is contaminated with PCBs, lie within town's boundaries.

g. Lee owns affected parcels of land contaminated with PCBs.

h. The public nuisance has damaged Lee's natural resources.

156.  Lee has suffered damages because Monsanto created this public nuisance.

157.  Monsanto's wrongful conduct was a substantial factor in causing harm to Lee.

158. Monsanto acted with malice, oppression, or fraud as required for an award of punitive damages. As alleged elsewhere, Monsanto deliberately misled buyers of PCBs and PCB containing products, users of PCBs and PCB-containing products, governments, and the public. Monsanto also concealed the dangers of PCBs. Monsanto knowingly caused injury to the public welfare to safeguard its own profits.

159. Each of the Defendants has succeeded to, and/or has agreed to bear, the liabilities of Original Monsanto relating to PCBs.

160. For these reasons, Lee prays for relief as set forth below.


**THIRD CAUSE OF ACTION**

**Continuing Private Nuisance, By the Town of Lee against all Defendants.**


161. The Town of Lee incorporates by reference each allegation contained above.

162. PCB contamination caused by Monsanto has obstructed the Town of Lee from owning and freely using its properties, so as to interfere with their comfortable enjoyment of life or properties:

a. The Town of Lee owns, leases, occupies, or controls submerged land in the River that is contaminated with PCBs. This submerged land continues to become contaminated because of PCB-laden discharges into the River.

b. T The Town of Lee owns, leases, occupies, or control buildings, schools, roadways, infrastructure, inland waters, and land that are contaminated with PCBs.

c. The Town of Lee leases, occupies, owns or control stormwater systems that receive PCB-laden water and solid materials (such as sediments).

e. PCB-laden sediment and other solid materials might deposit and/or accumulate in the Town of Lee stormwater systems.

163. This PCB contamination that interferes with the Town of Lee's property interests constitutes a nuisance:

a. PCB contamination of property owned, leased, occupied, or controlled by the Town of Lee City PCBs might have discharged into the river threatening the health of people who eat fish taken from the River.

b. PCB contamination of property owned, leased, occupied, or controlled by the Town of Lee interferes with the public's right to use the River for a range of beneficial uses including, but not limited to, recreational and fishing and boating.

38

c. Through PCB contamination of property owned, leased, occupied, or controlled by the C Town of Lee, Monsanto has unlawfully obstructed people from using the River, in the customary matter by limiting their ability to extract and consume fish or from using the River or use it for recreational activities  such as boating and fishing.

164. Each of these interferences is substantial and unreasonable, so as to be annoying, disturbing, offensive, or inconvenient to the ordinary person.

165. Monsanto, by acting or failing to act, created this private nuisance or permitted it to exist. Monsanto's conduct was intentional and unreasonable, or – at minimum – unintentional but negligent or reckless:

a. Monsanto made about 99% of the PCBs ever used in the United States.

b. Monsanto made virtually all the PCBs that contaminate the Town of Lee and the River today.

c. Despite knowing about their dangers, Monsanto wrongfully promoted and marketed PCBs and PCB-containing products for an extremely wide range of commercial, household, and industrial uses and applications. This promotion and marketing caused PCBs to be used or misused in a wide range of unsuitable commercial, household, and industrial uses and applications, from which PCBs would inevitably be discharged into the environment in large quantities.

d. Monsanto made false or misleading statements about the dangers of PCBs and PCB-containing products, the prevalence of PCBs in

products, the likelihood of PCB releases, and the prevalence of PCBs in the environment.

e. Monsanto also concealed the dangers of PCBs and PCB-containing products, the likelihood of PCB releases, and the prevalence of PCBs in the environment. Monsanto's concealment and false or misleading statements increased PCB sales, generating profits for the company at the expense of creating this nuisance.

f. Monsanto manufactured, promoted, marketed, distributed, and sold PCBs and PCB-containing products without providing adequate warnings and instructions about how they should be properly used, handled, and disposed. Monsanto also directed PCB customers and users to use, handle, and dispose PCBs in improper ways that caused PCBs to be released into the environment.

g. Despite knowing that more heavily chlorinated PCBs were more problematic pollutants, Monsanto nevertheless promoted, marketed, distributed, and sold them aggressively. To facilitate this conduct, Monsanto continued to invest heavily in expanding its manufacturing capacity for heavily chlorinated PCBs, long after the company learned about heavily chlorinated PCBs' particular risks.

h. Even after learning about PCB risks, Monsanto chose not to, or otherwise failed to, thoroughly investigate them.

i. Monsanto consciously decided not to, or recklessly or negligently failed to, recall or take back PCBs and PCB-containing products.

j. Monsanto's actions and failures to act caused PCBs to contaminate the Town of Lee and the River at levels that pose unacceptable

risks to human health and the environment.

166. The seriousness of the harm caused by Monsanto outweighs the social utility of Monsanto's conduct.

167. The Town of Lee did not consent to Monsanto's culpability for this private nuisance.

168. The harms associated with this private nuisance are reasonably abatable.

169. Monsanto has failed to abate this private nuisance.

170. Lee has suffered damages because Monsanto created this private nuisance.

    a. The private nuisance has caused the Town of Lee to incur damages in the form of monitoring, investigation, planning, compliance, and/or other costs and losses.

    b. The private nuisance has damaged Plaintiff's natural resources.

171. Monsanto's wrongful conduct was a substantial factor in causing harm to Lee.

172. Monsanto acted with malice, oppression, or fraud as required for an award of punitive damages. As alleged elsewhere, Monsanto deliberately misled buyers of PCBs and PCB containing products, users of PCBs and PCB-containing products, governments, and the public.
Monsanto also concealed the dangers of PCBs. Monsanto knowingly caused injury to the public welfare to safeguard its own profits.

173. Each of the Defendants has succeeded to, and/or has agreed to bear, the liabilities of Original Monsanto relating to PCBs.

174. For these reasons, the Town of Lee prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Continuing Trespass, By the Town of Lee  Against All Defendants.

175. The Town of Lee incorporates by reference each allegation contained
above.

176. The Town of Lee owns  leases, occupies, and/or controls buildings,
roadways, infrastructure, inland waters, and land contaminated with PCBs.
As previously alleged, the Town of Lee owns, leases, occupies, and/or
controls submerged bottomlands in the River. As previously alleged, the
Town of Lee owns affected parcels of land contaminated with PCBs.

177. Town of Lee has a right to exclusively possess certain buildings,
roadways, infrastructure, inland waters, and land contaminated with PCBs.
The Town of Lee has a right to exclusively possess their submerged
bottomlands in the River.

178. Monsanto caused PCBs to enter and contaminate the Town of Lee and
Town's property. Monsanto's conduct that caused this entry was
intentional and unreasonable, or unintentional but negligent or reckless:

   a. Monsanto made about 99% of the PCBs ever used in the United
   States.

   b. Monsanto made virtually all the PCBs that contaminate the Town
   of Lee and the River today.

   c. Despite knowing about their dangers, Monsanto wrongfully
   promoted and marketed PCBs and PCB-containing products for an
   extremely wide range of commercial, household, and industrial uses
   and applications. This promotion and marketing caused PCBs to be

used or misused in a wide range of unsuitable commercial, household, and industrial uses and applications, from which PCBs would inevitably be discharged into the environment in large quantities.

d. Monsanto made false or misleading statements about the dangers of PCBs and PCB-containing products, the prevalence of PCBs in products, the likelihood of PCB releases, and the prevalence of PCBs in the environment. Monsanto also concealed the dangers of PCBs and PCB-containing products, the likelihood of PCB releases, and the prevalence of PCBs in the environment. Monsanto's concealment and false or misleading statements increased PCB sales, generating profits for the company at the expense of creating this nuisance.

e. Monsanto manufactured, promoted, marketed, distributed, and sold PCBs and PCB-containing products without providing adequate warnings and instructions about how they should be properly used, handled, and disposed. Monsanto also directed PCB customers and users to use, handle, and dispose PCBs in improper ways that caused PCBs to be released into the environment.

f. Despite knowing that more heavily chlorinated PCBs were more problematic pollutants, Monsanto nevertheless promoted, marketed, distributed, and sold them aggressively. To facilitate this conduct, Monsanto continued to invest heavily in expanding its manufacturing capacity for heavily chlorinated PCBs, long after the company learned about heavily chlorinated PCBs' particular risks.

g. Even after learning about PCB risks, Monsanto chose not to, or otherwise failed to, thoroughly investigate them.

h. Monsanto consciously decided not to, or recklessly or negligently failed to, recall or take back PCBs and PCB-containing products.

i. Monsanto's actions and failures to act caused PCBs to contaminate the City, Towns and the River at levels that pose unacceptable risks to human health and the environment.

179. The Town of Lee did not authorize the entry of PCBs onto their property.

180. The entry of PCBs onto the Town of Lee's property, which Monsanto caused, was a substantial factor in causing actual harm to the Town of Lee.

a. The entry has caused the Town of Lee to incur damages in the form of monitoring, investigation, planning, compliance, and/or other costs and losses.

b. The entry of PCBs onto the Town of Lee's property has damaged their natural resources.

181. The harms associated with this trespass are reasonably abatable.

182. Monsanto acted with malice, oppression, or fraud as required for an award of punitive damages. As alleged elsewhere, Monsanto deliberately misled buyers of PCBs and PCB containing products, users of PCBs and PCB-containing products, governments, and the public. Monsanto also concealed the dangers of PCBs. Monsanto knowingly caused injury to the public welfare to safeguard its own profits.

183. Each of the Defendants has succeeded to, and/or has agreed to bear, the liabilities of Original Monsanto relating to PCBs.

184. For these reasons, the Town of Lee pray for relief as set forth below.

## VI. PRAYER FOR RELIEF

For these reasons, the Town of Lee seeks the following relief against the Defendants:

1. Compensatory damages, in an amount to be proved at trial;

2. Natural resource damages;

3. A court order based on a jury verdict that will require Monsanto to deposit funds awarded by a jury into an escrow  account so that Lee has the funds to move the 2,000,000 tons of PCB soil and mud projected to be dumped in Lee to an out of state location.

5. Punitive damages;

6. A court order restraining Defendants from their ongoing trespass on Lee's property;

7. Attorney's fees and expenses;

8. Costs of suit; and

9. Any other and further relief that the Court deems just, proper, and appropriate.

**VII. JURY DEMAND**

**The Plaintiffs demand a jury trial on all causes of action for which a jury is available under the law.**

Respectfully submitted by

<u>s/*Cristóbal Bonifaz, Esq.*</u>
Cristóbal Bonifaz MA Bar # 548405
*Law Offices of Cristóbal Bonifaz*
*180 Maple Street*
*Conway, Massachusetts 01341*
*Tel: 413-369-4263*
*Cell Number 413-522-7604*
*Electronic Mail ccrbonifaz@gmail.com*